**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CHLOE CARAS                                  )
2112 8th Street, N.W.                         )
Washington, D.C. 20001                       )
                                             )
        Plaintiff,                           )
                                             )
        v.                                   )        Case No. ___1:18-cv-00749___
                                             )
MIKE ISABELLA, INC.                          )
D/B/A MIKE ISABELLA CONCEPTS                 )
401 Massachusetts Avenue, N.W.               )
Suite 705                                    )
Washington, D.C. 20001;                      )
                                             )
MICHAEL ISABELLA                             )
401 Massachusetts Avenue, N.W.               )
Suite 705                                    )
Washington, D.C. 20001;                      )
                                             )
JOHANNES ALLENDER                            )
12154 Darnestown Road, Suite 621             )
Gaithersburg, MD 20878;                      )
                                             )
TAHA ISMAIL                                  )
708 Irving Street, N.E., Apt. 102            )
Washington, D.C. 20017;                      )
                                             )
GEORGE PAGONIS                               )
1700 Kalorama Road, N.W.                     )
Apt. 405                                     )
Washington, D.C. 20009;                      )
                                             )
NICHOLAS PAGONIS                             )
1111 W Street, N.W.                          )
Washington, D.C. 20009;                      )
                                             )
BALLCANTINA, LLC                             )
4000 Wilson Boulevard                        )
Arlington, VA 22203;                         )
                                             )

BALLKAP, LLC )
4000 Wilson Boulevard )
Arlington, VA 22203; )
)
BALLNOODLE, LLC )
4000 Wilson Boulevard )
Arlington, VA 22203; )
)
ISABELLA BELLA LLC )
707 6th St. N.W. )
Washington, D.C. 20001; )
)
REQWHARF, LLC )
12154 Darnestown Road, Suite 621 )
Gaithersburg, MD 20878; )
)
TYISA, LLC )
12154 Darnestown Road, Suite 621 )
Gaithersburg, MD 20878; )
)
                    Defendants. )
_____ )

## COMPLAINT AND JURY DEMAND

## PRELIMINARY STATEMENT AND INTRODUCTION

1.      This is a civil action against Mike Isabella, Inc., d/b/a Mike Isabella Concepts

("MIC") and its business entities Defendants BallCantina, LLC; BallKap, LLC; BallNoodle,

LLC; Isabella Bella, LLC; ReqWharf, LLC; and TyIsa, LLC, for declaratory, injunctive, and

monetary relief for injuries Plaintiff Chloe Caras sustained as a result of the sexual harassment

and retaliatory termination to which she was subjected at MIC, in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII'), and the D.C. Human Rights

Act ("DCHRA"), D.C. Code § 2-1402.11 et seq.  This is also an action against MIC's owners, Defendants Mike Isabella; Johannes Allender, Chief Financial Officer; Taha Ismail, Beverage Director; George Pagonis, Executive Chef; and Nicholas Pagonis, Director, in their individual capacities, for aiding and abetting the sexual harassment, and against Defendants Mike Isabella and Johannes Allender, in their individual capacities, for aiding and abetting the retaliation, in violation of D.C. Code § 2-1402.62.  Prior to her unlawful termination, Ms. Caras was Director of Operations for the Isabella Eatery ("the Eatery") and the highest-ranking woman in the MIC organization.

2.      Mr. Isabella, a celebrity chef and owner of twelve of the Washington, D.C. area's premier restaurants, and his all-male partners, created a sexually hostile work environment and condoned a climate of contempt for women at MIC's restaurants that stands out in an industry that is notorious for sexual harassment.  Mr. Isabella is well aware that male chefs have created a "bro culture" that has allowed such sexual harassment to flourish in the restaurant industry.  In a November 2017 open letter to male chefs, celebrity chef Tom Colicchio acknowledged the "dick culture" created by the "bros" in the industry.  See "An Open Letter to (Male) Chefs," *Medium* (November 8, 2017).  In a series of recent interviews, celebrity chef Anthony Bourdain acknowledged that male chefs create a "meathead bro culture" that denigrates and devalues women in myriad ways.

http://www.slate.com/articles/news_and_politics/interrogation/2017/10/anthony_bourdain_on_w

einstein_john_besh_and_meathead_restaurant_culture.html. MIC is a prime example of this "bro culture" that thrives on what Mr. Colicchio described as "ugly machismo." Mr. Isabella has long been on notice about the sexism that pervades the industry and his own establishments and has been criticized publicly for being "a knuckle-dragging Neanderthal who disrespected women." See "Mike Isabella is a (grand)mama's boy," *Washington Post* (June 21, 2011).

3. MIC has not been able to retain the few women chefs it has hired and women generally do not make it into the higher management ranks of Mr. Isabella's establishments. When Ms. Caras did, she became the target of extraordinary sex-based hostility and abuse. Defendants Isabella, Allender, Ismail, George Pagonis, and Nicholas Pagonis routinely subjected Ms. Caras to sexual harassment throughout her three-year tenure with MIC. The harassment consisted of: unwelcome touching; sexual advances; vulgar and explicitly sexual remarks and gestures; sexist insults and texts calling her a "dumb bitch" and a "whore"; and the dissemination of malicious and false rumors about her sexual history and activities, including that Mr. Isabella and other male executives had had sexual relations with her. On multiple occasions, Mr. Isabella sexually propositioned Ms. Caras and subjected her to degrading acts, including pulling her hair while standing behind her in a clear pantomime of having penetrative sex from the rear. MIC required Ms. Caras and other female employees to work in an environment in which Mr. Isabella and the other owners ogled and commented on female restaurant patrons they thought were "hot" and openly bragged about their sexual exploits with prostitutes. Mr. Isabella used restaurant

4

openings and work events as opportunities to bring and show off young, attractive women, whom he referred to as his "girlfriends." Mr. Isabella directed that managers name signature cocktails at MIC after sexual conquests and other inside jokes he had with MIC partners. Mr. Isabella and the partners named a cocktail at G by Mike Isabella "The Crossing Guard" and another at Kapnos Taverna "You Strong" to commemorate their sexual exploits with prostitutes in Europe. Mr. Isabella also demanded that Ms. Caras name a signature cocktail at his Pepita restaurant in Arlington, Virginia, "itchy kitty," a crude name he used when referring to a woman's vagina. She refused to do so.

4.      Ms. Caras sought Mr. Isabella's assistance in responding to harassment that the other owners and managers directed at her, to no avail. Instead, he blithely confirmed that the partner likely mistreated her because she is a woman and he is uncomfortable working with a woman in a management position. Mr. Isabella ignored complaints Ms. Caras and others raised about male chefs regularly subjecting female employees, including female wait staff, to sexual harassment, including at Kapnos Taverna in College Park, Maryland, and Yona, in Arlington, Virginia. Although on notice about the pervasive sexual harassment at his restaurants and Ms. Caras' specific complaints, Mr. Isabella took no corrective measures to reform the sexist culture he created and perpetuated in his establishments.

5.      Instead, MIC required employees -- the majority of whom are low wage earners -- to sign a Non-Disclosure Agreement ("NDA") as a condition of employment to conceal the

5

sexual harassment routinely engaged in at MIC's establishments and to intimidate employees from speaking out about workplace abuses. The NDA subjects employees, including wait staff earning $3.33 an hour plus tips in the District of Columbia, to a penalty of $500,000 plus attorneys' fees for each breach of "confidential information" for the employee's lifetime. The NDA defines "confidential information" to be any "details of the personal and business lives of Mike Isabella, his family members, friends, business associates and dealings…" While the NDA bars employees from disclosing information to "any person, firm or entity whatsoever," including the media, it fails to advise employees of their rights to report sexual harassment and other misconduct to the Equal Employment Opportunity Commission, the D.C. Office of Human Rights, or any other state or local agency or to retain their own counsel. MIC management threatened employees with enforcement of the NDA if they revealed misconduct engaged in by Mr. Isabella or his partners or made negative comments about sexual harassment at MIC to the media in connection with Ms. Caras' lawsuit.

6.      The sexual harassment and abuse came to a dramatic end for Ms. Caras at the Isabella Eatery on December 5, 2017 when a visibly intoxicated Mr. Isabella, in front of Ms. Caras and other employees, crudely suggested to an MIC Chef that he have sex with Ms. Caras. Ms. Caras objected to this offensive comment and attempted to leave the restaurant. Mr. Isabella chased after her, screaming that she was a "disrespectful bitch" and acting in a manner that she found frightening and physically menacing. When Ms. Caras reached the door, Mr. Isabella

6

terminated her and told her not to return to the restaurant. After terminating Ms. Caras, MIC continued its retaliatory campaign against her by opposing her entitlement to unemployment compensation benefits, by falsely telling the Virginia Employment Commission that Ms. Caras abandoned her post, and thereafter by pressuring MIC employees to sign false statements to that effect. Mr. Isabella pressured one employee to sign a statement that Ms. Caras had sexually harassed him on the day of her termination, an assertion that was absurd and knowingly false.

7. Mr. Isabella has allowed Partners and other male employees, including chefs, to assault female employees, without consequence, and has himself roughly grabbed and touched female chefs and other female employees in an aggressive, sexually degrading and unwelcome manner. Employees – male and female alike – have acknowledged that MIC is the worst environment for women in which they have ever worked.

## Jurisdiction and Venue

8. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this matter contains a federal question, and 28 U.S.C. § 2201, the Declaratory Judgment Act. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

9. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (b)(2), as a substantial number of the events, acts, or omissions giving rise to Ms. Caras' claims occurred in the District of Columbia.

## Parties

10.    Ms. Caras is an adult resident of the District of Columbia.  MIC employed Ms. Caras from 2015 to December 5, 2017, and her last position was Director of Operations for Isabella Eatery with additional management responsibilities at two MIC restaurants in the District of Columbia.  Ms. Caras is an employee within the meaning of Title VII, 42 U.S.C. § 2000e(f), and the DCHRA, D.C. Code § 2-1401.02(9).

11.    MIC is a for-profit private corporation that conducts business in the District of Columbia and is headquartered in the District of Columbia.  MIC has 15 or more employees and is engaged in interstate commerce, and thus is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b) and the DCHRA, D.C. Code § 2-1401.02(10).  For purposes of this Complaint, senior executives at the Company are hereinafter referred to as "Partners."  MIC now has more than a dozen restaurants in Washington, D.C., Maryland, and Virginia with an additional outpost at the Ronald Reagan National Airport.  MIC's newest and largest project, Isabella Eatery, is a food emporium in Tysons Galleria, a luxury retail outlet in Northern Virginia.  Along with its Partners, MIC exercised oversight and control over its restaurant locations, which included the authority to hire, discipline, and terminate its employees.  At all times relevant to this Complaint, MIC and its business entities maintained restaurant locations and exercised authority and control over the conduct of its employees and partners, including Defendants Isabella, Allender, Ismail, George Pagonis, and Nicholas Pagonis.

8

12.     Defendant Mike Isabella is the Owner of Defendant MIC and regularly conducts business from MIC's business locations in Washington, D.C.  Mr. Isabella is a resident of the District of Columbia.  He created a sexually hostile work environment for Ms. Caras in MIC's D.C. restaurants.  Mr. Isabella is an employer within the meaning of D.C. Code § 2-1401.02(10), and he aided and abetted the sexual harassment and retaliation against Plaintiff, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.62.

13.     Defendant Johannes Allender is the Chief Financial Officer of Defendant MIC and regularly conducts business from MIC's Washington, D.C. locations.  Mr. Allender is a resident of the State of Maryland.  He created a sexually hostile work environment for Ms. Caras at MIC restaurants in the District of Columbia.  Mr. Allender is an employer within the meaning of D.C. Code § 2-1401.02(10), and he aided and abetted the sexual harassment and retaliation against Plaintiff, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.62.

14.     Defendant Taha Ismail is the Beverage Director of Defendant MIC and regularly conducts business from MIC's business locations in Washington, D.C.  Mr. Ismail is a resident of the District of Columbia.  He created a sexually hostile work environment for Ms. Caras in MIC's D.C. restaurants and participated in harassing events in the District of Columbia.  Mr. Ismail is an employer within the meaning of D.C. Code § 2-1401.02(10), and he aided and

abetted the sexual harassment against Plaintiff, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.62.

15.    Defendant George Pagonis is the Executive Chef of Defendant MIC and regularly conducts business from MIC's business locations in Washington, D.C.  Mr. Pagonis is a resident of the District of Columbia.  He created a sexually hostile work environment for Ms. Caras in MIC's D.C. restaurants.  Mr. Pagonis is an employer within the meaning of D.C. Code § 2-1401.02(10), and he aided and abetted the discrimination against Plaintiff, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.62.

16.    Defendant Nicholas Pagonis is the Director of Operations of Defendant MIC and regularly conducts business from MIC's business locations in Washington, D.C.  Mr. Pagonis is a resident of the District of Columbia.  He subjected Ms. Caras to sexually harassing conduct in the District of Columbia.  Mr. Pagonis is an employer within the meaning of D.C. Code § 2-1401.02(10), and he aided and abetted the discrimination against Plaintiff, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.62.

17.    BallCantina, LLC, d/b/a Pepita is a for-profit limited liability corporation that conducts business in Virginia and is headquartered in Virginia.  Ms. Caras served as the Regional General Manager for Pepita until June 2017.  BallCantina, LLC, is an employer within the meaning of 42 U.S.C. § 2000e(b) and D.C. Code § 2-1401.02(10).  For purposes of this Complaint, BallCantina, LLC, is hereinafter referred to as "Pepita."

10

18.    BallKap, LLC, d/b/a Kapnos is a for-profit limited liability corporation that conducts business and is headquartered in Virginia.  Ms. Caras served as the Regional General Manager for Kapnos Taverna until June 2017.  BallKap, LLC, is an employer within the meaning of 42 U.S.C. § 2000e(b) and D.C. Code § 2-1401.02(10).  For purposes of this Complaint, BallKap, LLC, is hereinafter referred to as "Kapnos."

19.    BallNoodle, LLC, d/b/a Yona is a for-profit limited liability corporation that conducts business in Virginia and is headquartered in Virginia.  Ms. Caras served as the Regional General Manager for Yona until June 2017.  BallNoodle, LLC, is an employer within the meaning of 42 U.S.C. § 2000e(b) and D.C. Code § 2-1401.02(10).  For purposes of this Complaint, BallNoodle, LLC, is hereinafter referred to as "Yona."

20.    Isabella Bella, LLC, d/b/a Graffiato is a for-profit limited liability corporation that conducts business in the District of Columbia and is headquartered in the District of Columbia. Ms. Caras served as a manager for Graffiato from March 2017 to November 2017, and but for her termination, would have had ongoing managerial responsibilities at Graffiato as directed. Isabella Bella LLC, is an employer within the meaning of 42 U.S.C. § 2000e(b) and  D.C. Code § 2-1401.02(10).  For purposes of this Complaint, Isabella Bella, LLC, is hereinafter referred to as "Graffiato."

21.    ReqWharf, LLC, d/b/a Requin is a for-profit limited liability corporation that conducts business in the District of Columbia and is headquartered in Maryland.  Ms. Caras was

11

employed at Requin from September 2017 to October 2017, and but for her termination, would have had ongoing managerial responsibilities at Requin as directed. ReqWharf, LLC, is an employer within the meaning of 42 U.S.C. § 2000e(b) and D.C. Code § 2-1401.02(10). ReqWharf, LLC maintains its restaurant's premises at 100 District Square SW, Washington, D.C. 20024. At all times relevant to this Complaint, ReqWharf, LLC exercised authority and control over the conduct of its employees and partners, including Defendant Isabella, during the course of its business and while on MIC-controlled premises. For purposes of this Complaint, ReqWharf, LLC, is hereinafter referred to as "Requin."

22.    TyIsa, LLC, d/b/a Isabella Eatery is a for-profit limited liability corporation that conducts business in Virginia and is headquartered in Maryland. Ms. Caras was employed at Isabella Eatery from July 2017 until her termination. TyIsa, LLC, is an employer within the meaning of 42 U.S.C. § 2000e(b) and D.C. Code § 2-1401.02(10). For purposes of this Complaint, TyIsa, LLC, is hereinafter referred to as "Isabella Eatery."

## Factual Background

## The Sexually Hostile Environment at MIC Restaurants

23.    Mr. Isabella gained notoriety after competing on Season Six of Top Chef and Top Chef Duels. In 2011, Mr. Isabella was the runner up on Top Chef All-Stars. In 2012, Food & Wine magazine name Mr. Isabella The People's Best New Chef: Mid-Atlantic. In 2016, the Restaurant Association of Washington named Mr. Isabella Restaurateur of the Year. From 2011,

when he opened his first restaurant, Graffiato, to the present, Mr. Isabella has built a $30 million restaurant empire in the Washington, D.C. area, opening twelve restaurants to critical acclaim. Mr. Isabella's most ambitious project, Isabella Eatery, opened in Tysons Galleria in December 2017.

24.    Mr. Isabella and his MIC partners created a demeaning environment for women at all the restaurants they established. They directed hiring officials, like Ms. Caras, to hire women who were "hot" or "good looking" and commented on their physical attributes. Conversely, they directed that women they perceived to be "ugly" or physically unattractive be fired for contrived reasons. The Partners expressed their contempt for women by calling them "bitches" and "whores." Mr. Isabella routinely referred to women within and outside the Company, including restaurant patrons and business associates, as "bitches" and on occasions when he lost his temper, screamed at female employees, calling them bitches, whores, and worse.

25.    Mr. Isabella and his Partners also subjected female employees to stories about their sexual conquests. When the Partners returned from international culinary tours, they openly boasted about their sexual exploits with prostitutes. At nearly every restaurant opening and work event, Mr. Isabella brought young, attractive women, whom he referred to as his "girlfriends," and then demanded that Ms. Caras book a hotel room for him and his girlfriend for the night. Mr. Isabella and the other partners bragged to Ms. Caras and other employees about their sexual performance and regularly discussed "taking down" or "banging" women, which

13

were euphemisms they routinely used for having sex.  Defendant Nick Pagonis boasted that he had a "huge" penis and regularly discussed his sex life.  Defendant George Pagonis graphically described his girlfriend's body and bragged about his sexual exploits with her in front of Ms. Caras and other female employees.  When a former female chef interrupted and asked him to stop engaging in such vile comments, he mistreated her by branding her a "psycho" and "crazy," and referred to her and other women who quit their jobs at MIC in response to harassment by those names.  Mr. Nick Pagonis routinely referred to women as whores and used the word "pussy" as a matter of course in the workplace.  He also took delight in upsetting female employees by referring to male employees as "malaka," a word he said was a Greek term for "fat masturbator."

26.    Mr. Isabella and the Partners regularly referred to women they found attractive as "corn."  This term was a vulgar reference to a story Mr. Isabella regularly told about an MIC chef who had commented that a woman was "so hot, [he'd] eat the corn out of her shit."  The partners used the term to refer to female patrons that came into the restaurants.  During meetings at the restaurants, the partners often gathered at the bar and called out to each other, "Corn! Corn!" when attractive women walked in.  Defendant Isabella often sent Ms. Caras text messages with corn emoji pictures.  The Partners were aware that Ms. Caras found this offensive and took obvious delight in taunting her with this vulgar term.  The Partners often sat at the bar

14

of the MIC restaurants looking at pictures and/or videos of naked or semi-clad women on their mobile phones and commenting about their physical attributes.

27.     MIC's Partners also named several cocktails at MIC restaurants after inside jokes they shared, usually involving their sexual exploits with prostitutes and other women.  They named one cocktail at Kapnos Taverna "You Strong" because, they explained, one of the prostitutes with whom Mr. Pagonis had sex on a trip to Europe had purportedly said this to him. They named another cocktail at G by Mike Isabella "The Crossing Guard," a nickname the Partners explained Mr. Isabella had earned when they visited a brothel in Europe, and Mr. Isabella had directed each prostitute to service a particular partner and told her which sex act to perform on each partner.  Upon information and belief, the "Unfaithful," and "Almost There," cocktails at Kapnos Kouzina, the "Eye Candy" cocktail at Kapnos Taverna, and the "You Have a Wife?" cocktail at Graffiato were named after the Partners' sexual jokes and exploits.

28.     Mr. Isabella routinely drank throughout the day at his restaurants, and his behavior while intoxicated was often belligerent, threatening, and sexually inappropriate.  On a number of such occasions, Mr. Isabella drunkenly leaned toward Ms. Caras and asked her to kiss him.  He touched other female employees in the same unwelcome manner.  Ms. Caras rejected his sexual advances and made clear that she was not interested in having anything other than a professional relationship with him.  Mr. Isabella's persistent advances to Ms. Caras and other young female employees were reflective of the culture at MIC, where the Partners used their

15

positions of power and fame to mistreat and sexually harass women.  Mr. Isabella grabbed and sexually propositioned female employees, promising to make at least one female chef whom he came onto sexually "a superstar someday."

29.     Employees in MIC establishments had no effective avenues to challenge the sexist and sexually harassing conduct they experienced and when they raised concerns, they were threatened with enforcement of the NDA they had signed as a condition of employment. Although there was an employee handbook that discussed sexual harassment, it was simply window dressing.  MIC provided no training for managers or Partners about what constitutes sexual harassment or how to respond to complaints.  The handbook directed employees to complain to their immediate supervisor, without an alternative when the supervisor was the one harassing the employee, and employees who complained about sexual harassment at MIC suffered retaliation and threats to have their NDAs enforced if they disclosed their concerns to any third parties.

30.     Despite having approximately 1,000 employees, MIC did not establish a human resources department until October 2017.  MIC employees had no internal mechanisms to seek redress for sexual harassment.

**Defendants' Sexual Harassment of Ms. Caras**

31.     Ms. Caras is a 2006 graduate of Ithaca College and has worked in the restaurant industry for the last two decades.  Before joining MIC, Ms. Caras worked as an inaugural

16

General Manager for Matchbox Food Group, another prominent local restaurant chain in Washington, D.C. Ms. Caras started working for Mr. Isabella on February 2, 2015, as the Regional General Manager for Kapnos Taverna, Yona, and Pepita, in Arlington, Virginia. MIC was expanding and Ms. Caras was an integral part of the team that opened these three new restaurants over the span of ten months. As part of her duties, she managed 125 employees once the restaurants were in full operation. During the phase when these three restaurants were opening, Ms. Caras worked with Mr. Isabella daily as they made decisions together about menus, décor, staff, and restaurant operations in the three different concept establishments.

32.     As a General Manager, Ms. Caras regularly reported to Defendants Isabella, Nick Pagonis, George Pagonis, Ismail, and Allender. The higher-level management team at MIC restaurants is almost entirely male; Ms. Caras was one of a very few female managers at the General Manager level or above. The management team met on a weekly basis with various Partners, nearly always at an MIC restaurant in Washington, D.C., and general managers met monthly with the Partners in D.C. Ms. Caras was thus in frequent contact with all of the Partners and was routinely subjected to their sexist comments, insults, and ridicule.

33.     When the three restaurants for which she was responsible opened, Ms. Caras reported directly to Defendant Nick Pagonis, the Director of Operations for MIC. Mr. Pagonis reported directly to Mr. Isabella. Beginning in late 2015, Nick Pagonis began to criticize and berate Ms. Caras, citing small errors or perceived slights as excuses for this verbal abuse. In

17

stark contrast, Mr. Pagonis treated male employees whom he managed respectfully. Mr. Pagonis' antipathy towards Ms. Caras was so extreme that he even berated her when he learned that she had broken her foot. He sent her text messages stating that he was "livid with the news" about her foot. Mr. Pagonis' reaction to her injury baffled Ms. Caras, but demonstrated that Mr. Pagonis would seize upon any opportunity to criticize her.

34.    Mr. Pagonis routinely insulted Ms. Caras' intelligence and disparaged her work performance. He often questioned Ms. Caras' male subordinates at Kapnos Taverna, Yona, and Pepita about how often she was at the restaurant and made negative comments about her to the team in an effort to undermine her authority. In the fall of 2015, Ms. Caras complained to Mr. Isabella that Mr. Pagonis was mistreating her and described his sexist, demeaning, and undermining behavior that was impeding her ability to do her job. Mr. Isabella agreed that Mr. Pagonis was in fact mistreating her and acknowledged, "It's probably because you're a woman." Mr. Isabella explained that Mr. Pagonis was not comfortable working with female management employees and that he likely felt intimidated by Ms. Caras and resentful of her authority. Rather than take corrective action to protect Ms. Caras from Mr. Pagonis' mistreatment, Mr. Isabella merely told Ms. Caras that he was her "biggest supporter" and assured her that he was the "only one who matters." Mr. Isabella ignored the concerns Ms. Caras raised about Mr. Pagonis' abusive behavior and left her and other female employees to fend for themselves even though he had the ultimate authority to set the tone for the work environment at all MIC restaurants.

18

35.    In early 2015, MIC hired a new head chef, Jonah Kim, for the restaurant Yona, one of the restaurants Ms. Caras managed.  Mr. Kim managed the cuisine and food staff and Ms. Caras managed the front of the house operations, thus requiring them to collaborate on all restaurant decisions.  From the start, Mr. Kim refused to respect Ms. Caras' authority as General Manager and ignored her requests and instructions.  As a professional in the restaurant industry, Ms. Caras was accustomed to male chefs treating women disrespectfully and tried to work the issue out herself.  However, as the months went on, Mr. Kim became increasingly hostile whenever Ms. Caras discussed staffing, schedules, or other day-to-day operational issues with him, and threatened to "destroy" her.  He said, "You think Nick [Pagonis] gives you anxiety?  I could give you so much more."

36.    After one of Mr. Kim's tirades, Ms. Caras reported his abusive behavior to Mr. Isabella, who voiced skepticism that Mr. Kim's behavior was as severe as Ms. Caras had portrayed it.  Mr. Isabella only came to believe Ms. Caras after other employees expressed concerns to him about Mr. Kim's abusive behavior towards them.  Mr. Isabella terminated him eight months later, in June 2016, but only after Mr. Kim proved to be a mediocre chef.  Until his termination, Ms. Caras endured daily abuse from Mr. Kim.

37.    In addition to the conduct detailed above, Ms. Caras was forced to contend with Mr. Isabella's unwelcome sexual comments.  On March 11, 2016, Mr. Isabella struck up a conversation with Ms. Caras about naming a new cocktail at the Pepita restaurant in Arlington,

19

Virginia.  He joked that Ms. Caras should name it "itchy kitty," a crude reference to a vagina. Ms. Caras asked Mr. Isabella to stop goading her in this manner, but Mr. Isabella found Ms. Caras' discomfort with his vulgar comments amusing and kept repeating the phrase to her throughout the day.  Knowing that Ms. Caras was offended by his behavior, Mr. Isabella escalated the joke and texted "itchy kitty" to Ms. Caras.  When Ms. Caras asked him to stop repeating the crude phrase, Mr. Isabella replied, "What's wrong, u got one?"  A few days later, Mr. Isabella texted Ms. Caras to ask if she had named a cocktail "itchy kitty" yet.  His behavior was offensive and demoralizing.

38.     Throughout 2015, Defendants Nick Pagonis, George Pagonis, and Taha Ismail regularly exchanged sexist and other inappropriate texts with one another and the management team, and expected Ms. Caras to join in with them.  They referred to women as "cunts," "bitches," and "whores."  When Ms. Caras first joined the Company, she used this terminology in an effort to get along with the Partners and fit in because the Partners expected their employees to engage in the same offensive banter.  The Partners' constant use of sexist and inappropriate language normalized this behavior at the workplace, which created a warped sense for women about what behavior was to be tolerated and what banter was required to fit in. Female employees came to understand that the Partners conditioned success for women at MIC on their ability to engage in MIC's "bro culture."   Those who did not were written off as "not fun" and were managed out of their positions.

20

39.    On June 12, 2016, Ms. Caras attended the annual RAMMY Awards Gala, which honors individuals and businesses in the Washington, D.C. area's restaurant and foodservice community.  MIC won Restaurateur of the Year and hosted a party after the event to celebrate at the Graffiato restaurant in the city.  MIC provided unlimited alcohol to its attendees, and several employees, including Ms. Caras, drank excessively.  Ms. Caras spoke with Juan Rivera, the chef de cuisine of Kapnos Taverna and Pepita, during the party and later in the evening, he assisted Ms. Caras as she was leaving the party.  The next day, Defendant Allender sent Ms. Caras a text message, stating that he and others had heard that Ms. Caras and Mr. Rivera had sex at Graffiato during the party.  Mr. Allender followed up by asking, "Who was better[,] Juan or Adam," referring to another MIC employee, whom Ms. Caras had dated.  Ms. Caras was offended by Mr. Allender's question and told him that it was "not okay."  Ms. Caras reported Mr. Allender's remarks to Mr. Isabella, who feigned ignorance and said he had not heard the rumor.  Mr. Isabella failed to take any type of corrective measures or to prevent these types of comments from being made by MIC's Partners and others about Ms. Caras.

40.    Mr. Ismail also subjected Ms. Caras to insulting and demeaning sexual comments. On June 17, 2016, Ms. Caras sent him a text message asking for the name of the Company's coffee vendor.  When Mr. Ismail responded, he first called her "stupid" for not remembering the name, and then when he gave her the name of the male vendor Mr. Ismail also added, "Too bad he is not a chef.  [Be]cause you only do CHEFS."  Ms. Caras, who had already complained to

Mr. Isabella about sexist and insulting comments to and about her to no avail, knew that further complaints would be futile.

41.    On August 5, 2016, Mr. Ismail sent Ms. Caras a photo of Mr. Isabella and herself, with the caption, "You look like you want to fuck Mike so bad." On August 20, 2016, Ms. Caras sent Mr. Ismail a message to come to the Kapnos Taverna restaurant. Mr. Ismail responded by calling Ms. Caras a "whore" twice. Mr. Ismail regularly called Ms. Caras a whore, in person and in text messages, and found Ms. Caras' objection to his comments humorous, leading him to respond with further invectives and insults. Similarly, he sent Ms. Caras numerous text messages calling her a "dumb bitch." When Ms. Caras told him not to call her that, Mr. Ismail took obvious delight in upsetting her by leveling this insult repeatedly. In another text message, Ms. Caras asked Mr. Ismail for pricing information for a DJ MIC had used for a work event. Again shifting to sexually graphic talk, Mr. Ismail responded that the DJ "wanted to give it to you that night." Ms. Caras knew that objecting would only encourage more of the same.

42.    The Partners also regularly commented on Ms. Caras' body to other male employees, particularly about the size of her buttocks. Defendants George and Nick Pagonis routinely commented to MIC employees that "Chloe had a great butt for a white girl." Ms. Caras found these comments to be degrading. Other employees frequently heard the Partners discuss Ms. Caras' body and state that Ms. Caras was sexually promiscuous with the MIC staff. They regularly bragged to male employees that they "could fuck Chloe right now" or could "take

22

Chloe home tonight." They also falsely claimed that they had engaged in sex with Ms. Caras on several occasions.

43.     Mr. Isabella and Mr. Ismail also frequently touched Ms. Caras inappropriately, often in front of others, in an effort to demean and humiliate her. On two occasions including at Requin, in front of restaurant employees, Mr. Isabella and Mr. Ismail pulled Ms. Caras' hair while standing behind her in a clear pantomime of having penetrative sex from the rear. Both times, Ms. Caras found the behavior demeaning and physically aggressive and made clear that this vulgar conduct was unwelcome. Both men simply laughed and joked about this behavior, which they also did with other female employees, over their objections. Mr. Ismail regularly slapped Ms. Caras' forehead, causing Mr. Pagonis to laugh and tell Mr. Ismail that he could slap Ms. Caras on the forehead but "not the ass." Mr. Ismail and Mr. Isabella regularly made Ms. Caras uncomfortable by leaning in toward her to smell her hair and making nasty comments such as "you smell dirty" to demean her in front of others. Mr. Isabella and Mr. Ismail did not treat male employees in this manner.

44.     In or around August 2016, Ms. Caras learned that the Partners failed to protect other female employees from sexual harassment despite knowing the prevalence of it in their establishments. At that time, the staff at the Graffiato location in Richmond, Virginia, attended an event at a neighboring establishment, GWARbar. Executive Chef Matt Robinett was visibly intoxicated at the event. In this state, he opened the door to the GWARbar bathroom while a

23

female patron was inside. He closed the door, only to come back moments later with a male friend and open the door again. The female patron barricaded the door to prevent Mr. Robinett from coming in a third time. When the patron left the bathroom, Mr. Robinett found her and said, "Hey, nice vag" in front of a number of people, causing her humiliation. The patron published a review describing the incident on Yelp.com. Mr. Isabella and Mr. Ismail came to the restaurant to meet with Mr. Robinett following the incident. Employees witnessed the men laughing after their meeting with drinks in hand. The Partners did not terminate Mr. Robinett despite his misconduct and Mr. Robinett remained protective of Mr. Isabella and Mr. Ismail. He regularly threatened MIC staff with the NDA if they told anyone about Mr. Isabella or his cronies' misconduct, including the multiple occasions Mr. Isabella came to the restaurant with women, frequented strip clubs, or engaged in other drunken and inappropriate behavior.

45.     Mr. Robinett continued to harass female employees and patrons at Graffiato with impunity until his unrelated termination around October 2017. During Mr. Robinett's tenure, employees complained to Mr. Isabella and Mr. Ismail about sexual harassment at the restaurant and other mistreatment, to no avail. Mr. Robinett fired an employee a day after she made a formal complaint to Mr. Ismail about his harassing behavior. While firing her, Mr. Robinett acknowledged that he was aware that she had lodged the complaint and questioned why she had "martyred" herself. The employee sent a complaint to Mr. Isabella detailing the circumstances surrounding her retaliatory termination. Neither he nor anyone else at MIC responded.

24

46.     In October 2016, Mr. Isabella and several other employees, including Ms. Caras, had a few drinks at G by Mike Isabella after it had closed.  Mr. Isabella became very intoxicated and attempted to persuade the group to go to a strip club.  Nanda Bernandes, Mr. Isabella's Executive Assistant, intervened, and told everyone to go home while she ensured that Mr. Isabella reached his home safely.  Ms. Caras was relieved that Ms. Bernandes had managed to extricate them from the situation that evening.  However, Ms. Caras later learned that Mr. Isabella had boasted to the other partners that he and Ms. Caras had planned to go home together that evening and have sex, but that Ms. Bernandes had prevented that from happening.  Over Ms. Caras' objections, the Partners regularly repeated this falsehood about Ms. Caras to other male colleagues for almost a year after the incident.  On other occasions, Mr. Isabella demanded that his staff come with him to Empire, a strip club in D.C.  When one female employee refused to do so and attempted to leave to go home, Mr. Isabella screamed at her and directed profanity-laced threats at her, including the threat to terminate her if she did not come with him to the strip club. While in Richmond visiting Graffiato, Mr. Isabella made similar demands that staff come with him to Paper Moon, a strip club in Richmond.  Mr. Isabella publicized to employees that he had an "arrangement" with a stripper at the club, and employees were aware that he booked hotel rooms at the Quirk Hotel for them while he was in town.

47.     In March 2017, Mr. Isabella asked Ms. Caras to help turn around the Graffiato restaurant in Washington, D.C., which had been struggling under poor management for several

25

years.  Mr. Isabella trusted Ms. Caras to rebuild the restaurant's clientele and implement an effective management system, which she worked diligently to do until the time of her termination.  While MIC did not have a formal performance review process, Mr. Isabella made clear to Ms. Caras that his decision to ask her to help turn around Graffiato demonstrated his high regard for her performance.  Despite Ms. Caras' committed effort to improve the restaurant, Mr. Pagonis intentionally undermined her to the staff by suggesting to them that she lacked a strong work ethic and was a slacker.  For example, on occasions where Ms. Caras was not at Graffiato, Mr. Pagonis immediately informed Mr. Allender that Ms. Caras was missing, without determining first whether Ms. Caras was supposed to be working at Graffiato that day.  Mr. Allender then asked Ms. Caras to provide him with information about her whereabouts, despite the fact that Ms. Caras had consistently worked long hours and demonstrated her strong work ethic.  Mr. Pagonis and Mr. Allender did not scrutinize the activities of male managers in this manner.

48.    Despite Mr. Pagonis' unwarranted criticisms about her performance, Ms. Caras continued to advance at MIC.  In May 2017, Mr. Isabella promoted her to Director of Operations for the developing Isabella Eatery ("the Eatery"), Mr. Isabella's most ambitious venture.  The Eatery is a 41,000 square foot multi-concept food hall in Tysons Galleria, which opened in stages between December 2017 and January 2018.  In this position, Ms. Caras assumed significantly greater responsibilities and duties, which made Ms. Caras the highest-ranking

26

female employee at MIC.  Ms. Caras was responsible for interviewing and hiring an opening team of more than 75 employees.  She successfully built relationships with local businesses for potential partnerships and directed the day-to-day front of the house operations.  Ms. Caras also continued to oversee management at Graffiato and to assist with some of the restaurants she had helped to open in Arlington.  While no longer a General Manager, she still attended their meetings in D.C., as well as the weekly managers' meetings.

49.      Once Ms. Caras officially transferred to the Eatery in July 2017, Mr. Allender, who became her new supervisor, treated her with the same animosity she had experienced working under Mr. Pagonis' supervision.  Ms. Caras maintained her oversight job duties at Graffiato while in her new position at the Eatery, requiring her to put in even longer hours.  Mr. Allender refused to acknowledge Ms. Caras' workload and insultingly asked Ms. Caras' male subordinates at the Eatery, "What does Chloe even do here anyway?"  When Ms. Caras objected to Mr. Allender's behavior, and to the pervasive sexism at MIC, Mr. Allender dismissed her concerns and told her that she was overly emotional.  When Ms. Caras objected to that characterization as "sexist," Mr. Allender simply goaded her more.

50.      Despite Mr. Allender's hostility, Ms. Caras' job performance at the Eatery, Graffiato, and the Arlington restaurants remained at a high level.  As a result, Mr. Isabella increasingly relied on her to assist with new restaurants in Virginia and D.C.  In September 2017, Mr. Isabella asked Ms. Caras to assist with opening a Requin restaurant at The Wharf in

27

Southwest Washington, D.C., in addition to continuing to perform her duties at the Eatery and four other restaurants. The opening required Ms. Caras to work additional long hours, take on more staffing duties, and travel regularly between the Eatery and The Wharf.

51. On October 12, 2017, The Wharf opened with a four-day event, and Mr. Isabella placed Ms. Caras in charge of Requin's presence at the opening, which included staffing and running an outdoor taco stand and bar. Twenty thousand visitors arrived at The Wharf on each of the four days, and Ms. Caras received little to no support from the Partners. The Partners spent the first three days of the opening drinking to the point of intoxication, while also ogling and commenting on the physical attributes of female patrons and visitors at the Wharf. The Partners referred to them as "corn," the vulgar term they used for women they found sexually attractive. Ms. Caras confronted Mr. Isabella about the Partners' behavior that day and the lack of support they gave her and her staff. Mr. Isabella told her to take a break, and then proceeded to laugh with his other Partners about Ms. Caras' reaction. Later that evening, while at the Requin restaurant, Ms. Caras reminded Mr. Isabella that she and the other MIC employees had been instrumental in the restaurant's success at the event, and asked him to split the tips with them. Intoxicated, Mr. Isabella erupted into a fit of rage toward Ms. Caras, and threw a calculator at the wall near her head. Mr. Isabella's behavior frightened her.

52. In or around October 2017, Ms. Caras learned that Defendant George Pagonis, like the other Partners, had regularly disparaged her to MIC employees and employees of its

28

business partners.  Mr. Pagonis told employees and business partners that Graffiato was in "bad shape," and that Ms. Caras had failed to improve the restaurant.  He finished this critique by stating that he could not stand Ms. Caras and calling her a "whore."  Ms. Caras was well aware that Mr. Pagonis regularly made sexist and demeaning remarks about her to MIC employees but was shocked to learn that he had made such degrading remarks about her in front of its business partners as well.  Ms. Caras reported Mr. Pagonis's vile comments to Mr. Isabella, again hoping that he would act to put a stop to the behavior.  Instead, Mr. Isabella came to Mr. Pagonis' defense and denied that Mr. Pagonis had ever made those remarks without even asking him or other employees about the incident.

53.     Employees described MIC as the "worst environment" they have seen for female employees in the restaurant industry.  While very few female managers at MIC survived more than six months in their positions, those who did experienced similar sexually harassing conduct.  Mr. Isabella recently targeted a young female chef for unwelcome sexual advances.  In the few months of her employment, Mr. Isabella approached her while intoxicated and unexpectedly kissed her declaring that he intended to "make [her] a star."  MIC retained a male General Manager despite its knowledge that he had preyed on countless teenage servers at the Kapnos location in College Park, Maryland.  Ultimately, MIC terminated him for an unrelated reason.

29

**Defendants' Retaliatory Termination of Ms. Cara's Employment**

54.     On December 5, 2017, Ms. Caras worked at the Eatery with Mr. Isabella and Mr. Ismail. The Eatery had a soft opening that week and MIC scheduled its first phase opening for the following week. That day, Mr. Isabella told a male MIC employee the story behind the term "corn," explaining in front of other employees, including Ms. Caras, that an MIC chef had commented that a woman was "so hot, [he'd] eat the corn out of her shit." Ms. Caras was once again repulsed by this story.

55.     Later that evening, Ms. Caras was still at the restaurant because several employees worked until the late evening, and Ms. Caras had planned to give Chef Elliot Drew a ride home after his shift. At around 8:30 p.m., Ms. Caras was working on her laptop while sitting on a booth in the dining room of the Eatery's Graffiato. Mr. Ismail grabbed her legs and pulled her by the ankles so that her legs fell off the bench upon which they were resting. Ms. Caras firmly and repeatedly said, "Do not touch me," until Mr. Ismail, smirking, let her go. Ten minutes later, Mr. Ismail returned and pulled Ms. Caras by the ankles again.

56.     Later in the evening, Mr. Isabella joined Ms. Caras and Joe Palma, the Culinary Director of the Eatery, at the booth. Mr. Isabella had been drinking heavily throughout the day and appeared visibly intoxicated. Coming in from the kitchen, Mr. Drew approached Mr. Isabella with a question. While Ms. Caras did not hear the question, she heard Mr. Isabella respond, "If you sleep with Chloe you can." Ms. Caras found the comment highly offensive and

asked Mr. Isabella to stop, at which point Mr. Isabella erupted into a fit of rage. He yelled, "What, you don't like that?" He then baselessly accused Ms. Caras of sexually harassing Mr. Drew.

57.    Mr. Isabella, who is physically much larger than Ms. Caras, became even more intimidating when he was angry and intoxicated and he yelled and leveled threats. Unwilling to continue to interact with him while he was in this state, Ms. Caras walked away from him and went into the kitchen. Mr. Isabella got up from his chair and moved in her direction, hurling insults at her. Ms. Caras, who reasonably feared for her safety, continued to ask Mr. Isabella to stop and allow her to leave. Mr. Isabella followed her. As Ms. Caras exited the kitchen, Mr. Isabella demanded that she turn around and talk with him. Ms. Caras did not feel safe talking with Mr. Isabella given his behavior and declined to do so. He shouted that she was a "disrespectful bitch" and told her, "If you're going to be disrespectful, then you're done here." He told her not to return to the restaurant. As Ms. Caras reached the door to exit the restaurant, Mr. Isabella chased after her and continued calling her a "bitch" and tauntingly shouted, "Love you, Chloe, nice working with you." An employee heard Mr. Isabella yell "I'll fucking fire you." A number of employees witnessed Mr. Isabella's drunken tirade but none intervened on her behalf.

58.    The next day, MIC's Human Resources representative, Ket Raxajak, called Ms. Caras and asked if she planned to report to work that day. When Ms. Caras told Ms. Raxajak

31

that Mr. Isabella had terminated her, Ms. Raxajak stated that neither Mr. Isabella nor Mr. Allender had notified her about this and said she would call Ms. Caras back. When Ms. Raxajak called again, she told Ms. Caras that she still had a position with the Company. Confused, Ms. Caras explained that Mr. Isabella himself had made the decision to terminate her. She further told Ms. Raxajak that she had withstood sexual harassment at the Company for the past three years and questioned whether she could continue to work in such an environment. Ms. Raxajak asked to interview Ms. Caras about the sexual harassment and termination as part of HR protocol, to which Ms. Caras agreed. However, approximately twenty minutes after their call, MIC deactivated Ms. Caras' work email, cancelled her direct deposit for her paychecks, and removed her from the Eatery website. Ms. Caras sent Ms. Raxajak an email but she did not reply.

59.    Since Ms. Caras' termination, MIC has bullied employees and attempted to coerce them to lie about the events on December 5, 2017, and to state, falsely, that Mr. Isabella had not fired Ms. Caras. On December 6, 2017, the partners held their weekly managers' meeting at the Eatery. At the end of the meeting, Mr. Isabella announced, "Chloe is no longer with us."

60.    On December 7, 2017, Mr. Allender responded to Ms. Caras' December 6, 2017 email to Ms. Raxajak. Despite the fact that MIC had already taken actions to implement Mr. Isabella's termination of Ms. Caras, Mr. Allender wrote he was "concerned and confused" about

32

Ms. Caras' decision not to report to work and that she had not been terminated. Mr. Allender stated that he had asked Mr. Isabella about the evening's events and "it sounded like a miscommunication or misunderstanding." Mr. Allender told Ms. Caras "everyone [at the Eatery] was uncomfortable about the comments you made regarding Elliot [Drew] and I will investigate this further," implying falsely that she had sexually harassed Mr. Drew. Ms. Caras replied to Mr. Allender's email stating that she was going to contact an attorney. Mr. Allender responded by falsely asserting that Ms. Caras had abandoned her position and denying her request to meet alone with MIC's HR representative, Ms. Raxajak, even though Ms. Caras made clear that she felt most comfortable speaking with her. That same day, Mr. Isabella told Adam Howard, who was then Corporate Chef and a longtime MIC employee, "Chloe is gone, and it's my fault."

61.     MIC retaliated against Ms. Caras by contesting her claim for unemployment benefits, made on December 8, 2017, falsely stating that she had voluntarily resigned or had been terminated for misconduct for job abandonment. On December 21, 2017, Ms. Caras and Mr. Allender participated in a fact-finding interview with the Virginia Unemployment Commission. Mr. Allender provided a false account of Ms. Caras' termination stating that Ms. Caras had been teasing a fellow employee that evening, and Mr. Isabella had questioned her about it, which led to Ms. Caras leaving the restaurant. Mr. Allender stressed that he had been Ms. Caras' direct supervisor and therefore only he – and not Mr. Isabella -- could make the decision to terminate

33

her.  On December 26, 2017, the Commission determined that MIC failed to meet its burden to show that Ms. Caras voluntarily resigned or had been terminated for job abandonment.

62.    After being put on notice by Ms. Caras that she intended to bring legal claims against Defendants, they redoubled their efforts to strong-arm employees to make false statements about Ms. Caras, including that she walked off the job and abandoned her post.

63.    MIC's and the Partners' treatment of Ms. Caras is part of MIC's pattern and practice of sexual harassment of female employees, many of whom have quit their positions because they found the sexually hostile work environment intolerable.

### Defendant MIC's Enforcement of its Non-Disclosure Agreement with Employees

64.    From 2011 to present, MIC has required employees to sign a Non-Disclosure Agreement ("NDA") as a condition to employment with the Company.  The NDA prohibits employees, *inter alia*, from publishing, revealing, disseminating, or disclosing confidential information to any third parties.  Third parties are defined as, "any person, firm or entity whatsoever."  A true copy of the NDA is attached hereto as Exhibit A.

65.    Under MIC's NDA, "confidential information" is defined as, "[D]etails of the personal and business lives of Mike Isabella, his family members, friends, business associates and dealings…"  The NDA has a liquidated damage provision which requires employees to pay "the sum of Five Hundred Thousand Dollars ($500,000) . . . for *each* breach by you of the terms hereof" plus attorneys' fees."  (Emphasis added).  The NDA also entitles MIC "to obtain an ex

34

parte restraining order, preliminary injunction or permanent injunction preventing [] Disclosure" of confidential information.

66.     The NDA does not include any temporal restrictions – employees are bound to it for life.  It does not carve out an exception to allow employees to file a charge or assist with an investigation conducted by a government agency, including the U.S. Equal Employment Opportunity Commission.  It also does not carve out an exception for employees to discuss sexual harassment or other forms of discrimination with one another or with legal counsel.

67.     MIC management regularly reminded employees that they were bound by the terms of the NDA, particularly after the employees had witnessed Mr. Isabella intoxicated or with a "girlfriend."  Management also reminded employees that they were bound by the NDA during all-staff meetings at MIC restaurants.  Following publication of Ms. Caras' claims on March 19, 2018, in *The Washington Post*, MIC coached current employees about how to respond to press requests and again reminded them that they contractually could not publicize information about MIC without violating the NDA.

68.     Due to the breadth and scope of the NDA, former and current employees fear they are under a permanent prohibition from discussing sexual harassment they witnessed by the Partners or any other employee at MIC.  Many did not take legal action related to the harassment and/or retaliation they experienced because they believed that they were barred by the NDA from doing so.

35

69.     Due to the chilling effect of MIC's NDA, current and former employees that witnessed the Partners' sexually harassing conduct and comments toward Ms. Caras have confirmed that they believe they would be under an obligation to contest a subpoena for deposition in this case.

**Ms. Caras Has Exhausted Her Administrative Remedies**

70.     On March 19, 2018, Ms. Caras filed a civil complaint in D.C. Superior Court based on D.C. law claims and filed a charge with the Equal Employment Opportunity Commission asserting her Title VII claims.  On March 22, 2018, the EEOC, *sua sponte*, issued a Right to Sue Notice to Ms. Caras.  Accordingly, Ms. Caras exhausted all required administrative prerequisites to bringing this action by timely filing a charge with the U.S. Equal Employment Opportunity Commission on March 19, 2018 and filing the instant complaint within ninety days of her receipt of a Right to Sue Notice from the EEOC.  Ms. Caras has withdrawn her D.C. Superior Court lawsuit and has brought all claims, including her Title VII claims, in this one action.

**CAUSES OF ACTION**

**COUNT I:     DECLARATORY JUDGMENT AGAINST DEFENDANT MIC**

71.     Plaintiff hereby incorporates as though restated all of the factual allegations.

72.    Under 28 U.S.C. § 2201 of the Declaratory Judgment Act, this Court is empowered to declare the right and legal relations of the parties with respect to the NDA that MIC employees were mandated to sign.

73.    MIC's NDA prohibits employees, *inter alia*, from publishing, revealing, disseminating, or disclosing confidential information to any third parties. Third parties are defined as, "any person, firm or entity whatsoever."

74.    Under MIC's NDA, "confidential information" is defined as: "[D]etails of the personal and business lives of Mike Isabella, his family members, friends, business associates and dealings…" This definition is all encompassing and overbroad on its face. The NDA has a liquidated damage provision which requires employees to pay "the sum of Five Hundred Thousand Dollars ($500,000) . . . for *each* breach by you of the terms hereof" plus attorneys' fees." (Emphasis added). The NDA also entitles MIC "to obtain an ex parte restraining order, preliminary injunction or permanent injunction preventing [] Disclosure" of confidential information.

75.    The NDA does not include any temporal restrictions – employees are bound to it for life. It does not carve out an exception to allow employees to file a charge or assist with an investigation conducted by a government agency, including the U.S. Equal Employment Opportunity Commission. It also does not carve out an exception for employees to discuss sexual harassment or other forms of discrimination with one another or with legal counsel.

76.    The definition of "third parties" under the NDA fails to provide any exception for bound parties to file charges or aid the EEOC or other fair employment agencies in their investigation of charges, which impedes these agencies in their statutory duties to enforce Title VII and other non-discrimination statutes.  The NDA does not provide an exception that would allow employees to speak with law enforcement, file a complaint about unfair labor practices with the National Labor Relations Board, the Department of Labor, or any other federal, state or local agency.

77.    Under the contractual principles of the District of Columbia, MIC cannot enforce a restraining covenant against the bound parties without providing any reasonable duration or geographic limitation.  MIC cannot enforce a restraining covenant against the bound parties with an all encompassing, overbroad, and vague definition of confidential information.

78.    The liquidated damages provision of the NDA sets an unconscionably high value on the total damages for breaching the NDA, at $500,000 for loss or damages from each breach of the contract, such that it constitutes an illegal penalty.

79.    An actual, present, and justiciable controversy has arisen between Ms. Caras and Defendant MIC regarding whether Ms. Caras may interview informally and/or call witnesses to be deposed and to testify at trial due to the witnesses' understanding of their legal obligations under the NDA and fear of being sued by MIC.

38

80. Defendant MIC's conduct toward employees after Ms. Caras notified MIC that she was asserting legal claims against the Company has forced potential witnesses to choose between sharing relevant information about sexual harassment at MIC -- which is a form of legally protected activity -- or risking legal liability in the amount of $500,000 per each breach plus attorneys' fees if they do. Therefore, the NDA has and will continue to harm Ms. Caras in the prosecution of her claims. The controversy between the parties is thus substantial and demands specific relief through a decree of a conclusive character.

81. Ms. Caras seeks declaratory judgment from this Court that the NDA's provisions defining "Confidential Information" and "Third Parties" and its liquidated damages provision are unenforceable.

**COUNT II:** **HARASSMENT ON THE BASIS OF SEX IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e ET SEQ., AGAINST DEFENDANTS MIC, BALLCANTINA, BALLKAP, BALLNOODLE, ISABELLA BELLA, REQWHARF, AND TYISA.**

82. Plaintiff hereby incorporates as though restated all of the factual allegations.

83. Title VII prohibits discrimination on the basis of sex with respect to an employee's compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a). This includes sexual harassment through the creation of a hostile work environment.

84. Defendants created and maintained a sexually hostile work environment by, inter alia, subjecting Ms. Caras to sexualized comments, sexual advances, and touching, and to

39

discriminatory intimidation, humiliation, and hostility so severe and pervasive that it affected the conditions of Ms. Caras' employment. The Partners made explicit remarks about Ms. Caras' body, referred to her as a "whore" and a "dumb bitch," and grabbed her hair in an explicit simulation of sex. Ms. Caras put Defendants on notice that she objected to the Partners' abusive and discriminatory treatment and that of other male employees at MIC and its business entities, and Defendants failed to take action, thereby condoning and ratifying the Partners and others' discriminatory treatment.

85. Defendants are liable for the Partners' actions because the Partners are the owners and executives of MIC and its business entities. Defendants are also liable for the actions of male managers because Ms. Caras objected to the harassment directly to the Partners, who failed to take appropriate corrective action.

86. Defendants' actions directly and proximately caused Ms. Caras to suffer economic loss, including but not limited to salary and employee benefits, a loss of future professional opportunities and future income, and have caused damage to her professional reputation, humiliation, indignity, personal embarrassment, and pain and suffering.

87. Defendants took the actions complained of herein with actual intent to cause injury to Ms. Caras and these actions were done willfully and maliciously, or with reckless indifference to Ms. Caras' legal rights.

40

**COUNT III:    RETALIATION IN VIOLATION OF THE TITLE VII, 42 U.S.C. § 2000e ET SEQ., AGAINST DEFENDANTS MIC AND TYISA**

88.    Plaintiff hereby incorporates as though restated all of the factual allegations.

89.    Title VII makes it unlawful for an employer to discriminate against any of its employees because an employee has opposed any practice made unlawful by Title VII.

90.    Ms. Caras engaged in protected activity under Title VII by opposing treatment that constituted unlawful harassment, including objecting to the sexual or demeaning comments, instances of inappropriate touching, and sexual gestures and advances Defendants made toward her.  Ms. Caras also engaged in protected activity by rejecting Mr. Isabella's sexual advances. Ms. Caras also reported and opposed Jonah Kim, Mr. Allender, and Nick Pagonis' sexist comments and discriminatory treatment of her to Mr. Isabella.  On December 5, 2017, Ms. Caras objected to Mr. Isabella's comment that Mr. Drew should "sleep with" Ms. Caras, by asking him to stop and attempting to leave the restaurant.

91.    MIC and TyIsa took adverse actions against Ms. Caras that were causally connected to her protected activity.  Mr. Isabella terminated Ms. Caras' employment in direct response to her objection to his sexual comment about her and her request that he stop engaging in a sexist and threatening tirade.  Other instances of retaliation include, *inter alia*, Mr. Allender's retaliatory harassment when Ms. Caras informed him that she was contacting an attorney, Mr. Allender making false statements about Ms. Caras' termination in an unemployment fact-finding interview before the Virginia Employment Commission in an

41

attempt to disqualify her for unemployment benefits, and MIC's actions pressuring employees to make false statements about Ms. Caras that would impugn her character and harm her reputation.

92.    Defendants MIC and TyIsa's actions directly and proximately caused Ms. Caras to suffer economic loss, including but not limited to salary and employee benefits, a loss of future professional opportunities and future income, in addition to damage to her professional reputation, humiliation, indignity, personal embarrassment, and pain and suffering.

93.    Defendants have engaged in a pattern and practice of retaliating against employees who complain about gender discrimination and/or sexual harassment.

94.    Defendants MIC and TyIsa took the actions complained of herein with actual intent to cause injury to Ms. Caras and these actions were done willfully and maliciously, or with reckless indifference to Plaintiff's legal rights.

**COUNT IV:    HARASSMENT ON THE BASIS OF SEX IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE § 2-1401.1 ET SEQ., AGAINST DEFENDANTS MIC, BALLCANTINA, BALLKAP, BALLNOODLE, ISABELLA BELLA, REQWHARF, AND TYISA, AND THE DEFENDANTS ALLENDER, ISABELLA, ISMAIL, GEORGE PAGONIS, AND NICHOLAS PAGONIS.**

95.    Plaintiff hereby incorporates as though restated all of the factual allegations.

96.    The District of Columbia Human Rights Act prohibits discrimination on the basis of sex with respect to an employee's compensation, terms, conditions, and privileges of

42

employment.  D.C. Code § 2-1402.11(a)(1).  This includes sexual harassment through the creation of a hostile work environment.

97.     Defendants Allender, Isabella, Ismail, George Pagonis, and Nick Pagonis aided, abetted, invited, compelled, and coerced the harassing conduct complained of herein in violation of the District of Columbia Human Rights Act.

98.     Defendants created and maintained a sexually hostile work environment by, inter alia, subjecting Ms. Caras to sexualized comments, sexual advances, and touching, and to discriminatory intimidation, humiliation, and hostility so severe and pervasive that it affected the terms and conditions of Ms. Caras' employment.  Defendants made explicit remarks about Ms. Caras' body, referred to her as a "whore" and a "dumb bitch," and grabbed her hair in an explicit simulation of sex.  Defendants were put on notice by Ms. Caras that she objected to their abusive and discriminatory treatment and that of other male employees at MIC and its business entities, and Defendants failed to take action, thereby condoning and ratifying their and others' discriminatory treatment.

99.     Defendants' actions directly and proximately caused Ms. Caras to suffer economic loss, including but not limited to salary and employee benefits, a loss of future professional opportunities and future income, and have caused damage to her professional reputation, humiliation, indignity, personal embarrassment, and pain and suffering.

100.    Defendants took the actions complained of herein with actual intent to cause injury to Ms. Caras and these actions were done willfully and maliciously.

**COUNT V:    RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE § 2-1401.1 ET SEQ., AGAINST DEFENDANTS MIC AND TYISA AND DEFENDANTS ALLENDER AND ISABELLA**

101.    Plaintiff hereby incorporates as though restated all of the factual allegations.

102.    The District of Columbia Human Rights Act prohibits retaliation against an employee for opposing any practice made an unlawful employment practice under the District of Columbia Human Rights Act.

103.    Defendants Allender and Isabella aided, abetted, invited, compelled, and coerced the discriminatory conduct complained of herein in violation of the District of Columbia Human Rights Act.

104.    Ms. Caras engaged in protected activity by opposing treatment that constituted unlawful harassment, including objecting to the sexual or demeaning comments, instances of inappropriate touching, and sexual gestures and advances Defendants made toward her.  Ms. Caras also engaged in protected activity by rejecting Mr. Isabella's sexual advances.  Ms. Caras also reported and opposed Jonah Kim, Mr. Allender, and Nick Pagonis' sexist comments and discriminatory treatment of her to Mr. Isabella.  On December 5, 2017, Ms. Caras objected to

44

Mr. Isabella's comment that Mr. Drew should "sleep with" Ms. Caras, by asking him to stop and attempting to leave the restaurant.

105.    MIC and TyIsa took adverse action against Ms. Caras that was causally connected to her protected activity.  Mr. Isabella terminated Ms. Caras' employment in direct response to her request that he stop his sexist and threatening tirade.  Other instances of retaliation include, inter alia, Mr. Allender's retaliatory harassment when Ms. Caras informed him that she was contacting an attorney, and Mr. Allender making false statements about Ms. Caras' termination in an unemployment fact-finding interview before the Virginia Employment Commission in an attempt to disqualify her for unemployment benefits.

106.    Defendants' conduct was intentional, deliberate, willful, and conducted with reckless disregard for Ms. Caras' legally protected rights.  Defendants have engaged in a pattern and practice of retaliating against employees who complain about gender discrimination or sexual harassment.

107.    Defendants' actions directly and proximately caused Ms. Caras to suffer economic loss, including but not limited to salary and employee benefits, a loss of future professional opportunities and future income, in addition to damage to her professional reputation, humiliation, indignity, personal embarrassment, and pain and suffering.

108.    Defendants took the actions complained of herein with actual intent to cause injury to Ms. Caras and these actions were done willfully and maliciously.

45

**COUNT VI:    ASSAULT AGAINST DEFENDANTS ISABELLA, MIC, REQWHARF, AND TYISA**

109.    Plaintiff hereby incorporates as though restated all of the factual allegations.

110.    Defendant Isabella engaged in physical attempts to cause a harmful or offensive contact with Ms. Caras or to cause an apprehension of such contact when he threw a calculator near her head on October 12, 2017, and when he chased her through Isabella Eatery while shouting sexist slurs and threatening invectives at her during her termination on December 5, 2017.  These instances gave Ms. Caras the apprehension of injury.

111.    As a result of Defendant Isabella's action, Ms. Caras suffered psychological and emotional harm, including fear, anxiety, loss of sleep, an inability to concentrate, and emotional distress.

112.    MIC, ReqWharf, and TyIsa are liable for Mr. Isabella's tortious conduct because he engaged in the conduct as part of his and Ms. Caras' employment.  Both assaultive incidents occurred within the authorized time and space limits of their employment, while Mr. Isabella was supervising Ms. Caras' work, and both incidents of assault were in reaction to situations arising from and with their shared work and colleagues, including Ms. Caras' termination from MIC.

113.    As a direct and proximate result of Defendants' conduct, Ms. Caras sustained injuries on October 12, 2017 and December 5, 2017, and thereafter, including but not limited to the  psychological harm and the continuing emotional harm of the trauma she experienced.

46

114.    Defendants MIC, ReqWharf, and TyIsa took the actions complained of herein with actual intent to cause injury to Ms. Caras and these actions were done willfully and maliciously.

**COUNT VII: BATTERY AGAINST DEFENDANTS ISABELLA, ISMAIL, MIC, REQWHARF, AND TYISA**

115.    Plaintiff hereby incorporates as though restated all of the factual allegations.

116.    The District of Columbia, Virginia and Maryland prohibit as a battery the intentional, unpermitted, harmful or offensive contact with another person.

117.    On many occasions within one year of today's date, Defendants Isabella and Ismail committed battery on Ms. Caras when they intentionally and without permission: grabbed Ms. Caras' hair and pulled her backwards to simulate penetrative sex; touched Ms. Caras' hair or put their noses in her hair to smell it; and on December 5, 2017, when Defendant Ismail on two occasions grabbed her legs and pulled her by the ankles causing her legs to fall off the bench upon which they were resting.  Their physical contact with Ms. Caras was intentional, without permission, and constituted offensive contact with her body.

118.    Defendants MIC, Isabella, Ismail, ReqWharf, and TyIsa took the actions complained of herein with actual intent to cause injury to Ms. Caras and these actions were done willfully and maliciously.

47

## COUNT VIII: PREMISES LIABILITY AGAINST DEFENDANTS MIC, REQWHARF, AND TYISA

119.    Plaintiff hereby incorporates as though restated all of the factual allegations.

120.    Defendants MIC and ReqWharf occupied, and/or oversaw employees who occupied, restaurant premises at Requin at the Wharf at all times relevant to this Complaint. Defendants acted as business invitors on October 12, 2017, at which time Mr. Isabella assaulted Ms. Caras by throwing a calculator toward her head.

121.    Defendants MIC and TyIsa occupied, and/or oversaw employees who occupied, restaurant premises at the Isabella Eatery at all times relevant to this Complaint.  Defendants acted as business invitors on December 5, 2017, at which time Mr. Isabella assaulted Ms. Caras by chasing her through Isabella Eatery while shouting threatening invectives at her and physically menacing her.

122.    Ms. Caras was a business invitee to the Requin and Isabella Eatery premises on October 12, 2017, and December 5, 2017.

123.    As the possessors of Requin, Defendants MIC and ReqWharf had a special relationship with Ms. Caras of business invitor and business invitee, giving rise to a duty to protect her from assaults while she is upon the premises.

124.    As the possessors of Isabella Eatery, Defendants MIC and TyIsa had a special relationship with Ms. Caras of business invitor and business invitee, giving rise to a duty to protect her from assaults while she is upon the premises.

48

125.    Defendants MIC and TyIsa knew that MIC occupied its premises at Isabella Eatery on December 5, 2017.  They also knew or should have known that Mr. Isabella was likely to misuse alcohol while on the premises and had a history of erratic and aggressive behavior while in the restaurant premises.  They knew or should have known that Mr. Isabella had been drinking excessively on a near daily basis in the several weeks leading up to Isabella Eatery's public opening, which exacerbated his erratic and violent behavior.

126.    Defendants' actions directly and proximately caused Ms. Caras to suffer physical harm, substantial and continuing emotional harm due to the trauma she experienced, and other injury.

127.    Defendants MIC, ReqWharf, and TyIsa took the actions complained of herein with actual intent to cause injury to Ms. Caras and these actions were done willfully and maliciously.

## REQUESTED RELIEF

WHEREFORE, Plaintiff demands a trial by jury and prays this Court for the following relief:

1.      Issuance of a declaratory judgment for the relief sought, including a judgment that MIC's Non-Disclosure Agreement is invalid and unenforceable;

2.      Enter a judgment in Ms. Caras' favor and against Defendants MIC, BallCantina, BallKap, BallNoodle, Isabella Bella, ReqWharf, and TyIsa, for harassment on the basis of sex and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq;

3.      Enter a judgment in Ms. Caras' favor and against Defendants MIC, BallCantina, BallKap, BallNoodle, Isabella Bella, ReqWharf, TyIsa, Allender, Isabella, Ismail, George Pagonis, and Nicholas Pagonis for harassment on the basis of sex and retaliation in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq.;

3.      Enter a judgment in Ms. Caras' favor and against Defendants Isabella, MIC, ReqWharf and Tysia for assault;

4.      Enter a judgment in Ms. Caras' favor and against Defendants Isabella, Ismail, MIC, ReqWharf and Tysia for battery;

5.      Enter a judgment in Ms. Caras' favor and against Defendants MIC, ReqWharf, and Tysia for premises liability;

50

6.     Award Ms. Caras compensatory damages for the pain and suffering, damage to career, and loss of enjoyment of life, that she has experienced as a result of Defendants' unlawful conduct in an amount to be determined at trial;

7.     Award Ms. Caras punitive damages in an amount to be determined at trial;

8.     Award Ms. Caras back pay, front pay (if reinstatement is deemed impracticable), and other amounts necessary to make her whole for the unlawful actions taken against her;

9.     Award Ms. Caras' reasonable attorneys' fees, litigation expenses, and costs;

10.    Enter an order enjoining Defendants, or each of them, to do all that is necessary in law or in equity to make Ms. Caras whole for the damages and injuries alleged herein; and

11.    Award Ms. Caras all other relief permitted under the above causes of action or which the Court deems just and proper.

Respectfully submitted,


Debra S. Katz (D.C. Dist. Ct. No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
Ph:     (202) 299-1140
Fax:    (202) 299-1148
Email: katz@kmblegal.com

51

_____

Lisa Banks (D.C. Dist. Ct. No. 470948)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
Ph:    (202) 299-1140
Fax:    (202) 299-1148
Email: banks@kmblegal.com

_____

Harini Srinivasan (D.C. Dist. Ct. No. 1032002)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
Ph:    (202) 299-1140
Fax:    (202) 299-1148
Email: srinivasan@kbmblegal.com

Attorneys for Plaintiff Chloe Caras

Dated:  April 3, 2018

52

## JURY DEMAND

Plaintiff requests trial by jury as to all issues in this case.


_____
Debra S. Katz (Bar No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
Ph:    (202) 299-1140
Fax:   (202) 299-1148
Email: katz@kmblegal.com


Attorney for Plaintiff Chloe Caras


Date:  April 3, 2018

53